UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re ) | Chapter 11 Case |
| ) |  |
| AMES DEPARTMENT STORES, INC., *et al.*, ) | No. 01-42217 (REG) |
| ) |  |
| Debtors. ) | Jointly Administered |

**DECISION ON POST-HEARING DISPUTE BETWEEN
AMES, GRANITE NATIONAL REALTY, AND
STOP & SHOP SUPERMARKET COMPANY**

APPEARANCES:

WEIL GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
By:    Martin J. Bienenstock, Esq.
       Michelle J. Meises, Esq.
       Timothy Q. Karcher, Esq.
Counsel for Ames Department Stores, Inc.

MENTER, RUDIN & TRIVELPIECE, P.C.
500 South Salina Street, Suite 500
Syracuse, New York 13202
By:    Kevin M. Newman, Esq.
       Josephine Yang-Patyi, Esq.
Counsel for Granite National Realty, LLC

WHITE & CASE LLP
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
By:    Frank L. Eaton, Esq.
Counsel for The Stop & Shop Supermarket Company LLC

BEFORE:    ROBERT E. GERBER
           UNITED STATES BANKRUPTCY JUDGE

In this contested matter in the chapter 11 case of Ames Department Stores, landlord Granite National Realty objected to Ames's proposed assumption and assignment of a Lease to The Stop & Shop Supermarket Company. After a hearing on the matter, the Court permitted Ames to assume and assign the Lease to Stop & Shop. But the Court reserved judgment on whether Article VIII, Section 6 of the Lease (the "Averaging Provision")—which allows Granite to replace the Lease's standard percentage rent formula with a calculation based on the average sales of the preceding three years in the event of a vacating, assumption, or assignment—constitutes an unenforceable anti-assignment provision under section 365(f) of the Code. The Court directed Ames to place in escrow the disputed cure amount of $83,617.59 pending this determination.

Now, upon review, the Court finds that the Averaging Provision is enforceable. In substance, the Averaging Provision provides a means for the landlord to secure the continued benefit of its bargain for the payment of percentage rent, and does not unduly impede or condition the right of assignment. Accordingly, the Averaging Provision remains enforceable, notwithstanding section 365(f).

## I. BACKGROUND

### A. The Court's Earlier Orders

Until it became clear that Ames could not successfully reorganize as an ongoing business and would have to liquidate, Ames operated hundreds of retail stores in leased premises.[1] An important aspect of Ames's chapter 11 case has involved efforts to derive

---

[1] *Hannaford Bros. Co. v. Ames Dep't Stores, Inc. (In re Ames Dep't Stores, Inc.)*, 316 B.R. 772, 779 (Bankr. S.D.N.Y. 2004) (Gerber, J.) ("*Hannaford*"); *NWL Holdings, Inc. v. Eden Center, Inc. (In re Ames Dep't Stores, Inc.)*, 317 B.R. 260, 262 (Bankr. S.D.N.Y. 2004) (Gerber, J.) ("*NWL Holdings*").

1

value from these store leases, particularly by "assume and assign" transactions following the sale of leases or the sale of rights to designate leases.[2]

In December 2002, Ames filed a motion for an order approving the sale of designation rights to Stop & Shop, contemplating the subsequent assumption, assignment, and sale of leases to Stop & Shop.[3] By order dated December 18, 2002 (the "Designation Rights Order"), that motion was approved.[4] Among other things, the Designation Rights Order provided:

> The Court retains jurisdiction to interpret and enforce the terms of this Order and the Designation Rights Agreement, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to, or affecting, any of the transactions contemplated by the Designation Rights Agreement, including without limitation, the assumption, assignment and transfer of the Leases to Designees . . . .[5]

Pursuant to the Designation Rights Order, Ames served a Designation Notice[6] upon Granite to notify Granite of Ames's intention to assume and assign to Stop & Shop the Lease governing an Ames store in Old Saybrook, Connecticut (the "Lease").[7] Thereafter, Granite filed an objection to the Designation Notice, asserting rights to a cure

---

[2]   *Id. See also In re Ames Dep't Stores, Inc.*, 287 B.R. 112 (Bankr. S.D.N.Y. 2002) (Gerber, J.) (discussing the lease marketing process and explaining how designation rights transactions work).

[3]   Main Case ECF # 1479.

[4]   Main Case ECF # 1611.

[5]   *Id.*

[6]   Ames served its initial Designation Notice on June 5, 2003, and served an amended Designation Notice on June 27, 2003. *See* Kevin M. Newman, Affidavit in Support of Granite National Realty, LLC's Objection to Notice of Proposed Assumption and Assignment of Lease of Non-Residential Real Property to The Stop & Shop Supermarket Company ¶¶ 4, 8 (Oct. 28, 2003) ("Newman Affidavit"). The Court refers to the Designation Notice as amended.

[7]   A copy of the Lease is attached as Exhibit B to Ames's Post-Hearing Memorandum of Law in Response to Granite National Realty, LLC's Post-Hearing Memorandum of Law on [Ames's] Proposed Assumption and Assignment of Lease of Nonresidential Real Property to The Stop & Shop Supermarket Company (Nov. 18, 2003) ("Ames Brief"). The Lease was amended by letter agreement dated June 14, 1984 ("Lease Amendments"). *See* Ames Brief Exhibit C. The Court refers to the Lease as amended.

2

payment of approximately $83,000. Ames and Stop & Shop responded to Granite's objection by contending that the cure payment was not required because the Averaging Provision, on which the cure was based, constituted an unenforceable anti-assignment provision.[8]

In an order dated October 31, 2003 (the "Assignment Order"), the Court permitted Ames to assume and assign the Lease to Stop & Shop, while reserving judgment as to the issue now before the Court.[9] Ames escrowed the $83,000 pending this decision.

## B.     The Lease

According to the Lease, percentage rent is generally to be paid "in a sum equal to two percent (2%) of that portion of such gross sales which during each Fiscal Year exceeds [$6,000,000]."[10] In some of the years immediately preceding the instant controversy, this meant that a significant portion of rent was payable in the form of percentage rent. For example, when base rent stood at $135,000 per year, percentage rental obligations for the 1999, 2000, and 2001 Fiscal Years amounted to approximately $94,000, $104,000, and $53,000 respectively.[11] Using these figures, percentage rent as a percentage of total rent paid was 41% in 1999, 43% in 2000, and 28% in 2001.

---

[8]     See Ames Brief at 15-24; Response of The Stop & Shop Supermarket Company in Opposition to Granite National Realty, LLC's Post-Hearing Memorandum of Law to [Ames's] Proposed Assumption and Assignment of Lease of Nonresidential Real Property to The Stop & Shop Supermarket Company 2-6 (Nov. 18, 2003) ("Stop & Shop Brief").

[9]     Assignment Order at 2 (Main Case ECF # 2402).

[10]    See Ames Brief Exhibit B, Lease Article VIII, Section 2; Ames Brief Exhibit C, Lease Amendments ¶ 4 (reducing the threshold from $6,400,000 to $6,000,000).

[11]    See Granite National Realty, LLC's Post-Hearing Memorandum of Law on [Ames's] Proposed Assumption and Assignment of Lease of Non-Residential Real Property to The Stop & Shop Supermarket Company 4 (Oct. 28, 2003) ("Granite Brief"). See also Ames Brief Exhibit A; Ames Brief Exhibit B, Lease Article VI; Stop & Shop Brief at 3.

3

In order to provide Granite with rental revenue in the event the tenant vacated, assumed, or assigned the leased premises, the Averaging Provision provides for an alternative calculation:

> Notwithstanding anything herein contained to the contrary if Tenant shall assign or sublet the whole of the demised premises for use other than as a discount department store (other than to its parent subsidiary or affiliated companies) or if Tenant shall vacate demised premises, *then Landlord may elect* that the gross sales *for each succeeding Fiscal Year* for percentage rent purposes, be computed as the higher of the average of gross sales reported by Tenant *for and with respect to the last three (3) Fiscal Years immediately preceding such assignment subletting or vacating* of demised premises or the last full Fiscal Year preceding any such occurrence.  For so long as such assignment or subletting or vacating shall exist, this Article shall be of no further effect hereunder.[12]

By a letter agreement dated June 14, 1984, the Averaging Provision was amended as follows:

> Notwithstanding [the Averaging Provision], if you assign the Lease or sublet the entire demised premises we may elect to have the balance of Article VIII remain in full force and effect with respect to the assignee or sub-tenant, in addition to the elections given us in [the Averaging Provision].  If we elect the continued applicability of Article VIII, then for so long as such assignment or subletting shall exist, [the Averaging Provision] shall be of no further force or effect.[13]

According to the Lease, the fiscal year is a period of 52 weeks "terminating the last Saturday in January of each year"[14]—a fiscal year that approximates the calendar

---

[12]   Ames Brief Exhibit B, Lease Article VIII, Section 6 (emphasis added).

[13]   Ames Brief Exhibit C, Lease Amendments ¶ 3.

[14]   Ames Brief Exhibit B, Lease Article VIII, Section 1.

4

year.[15] A statement showing gross sales for any fiscal year shall be provided, and percentage rent paid "[o]n or before the one hundred twentieth (120th) day following the end of each Fiscal Year . . . ."[16] In other words, percentage rent is not due until late May of each year, and is computed with respect to the operating performance of the preceding year.

## II.   DISCUSSION

### A.   Jurisdiction

Granite argues that this Court lacks subject matter jurisdiction to immerse itself in the present controversy. Considering this matter first,[17] the Court disagrees.

The subject matter jurisdiction of the district court (and hence this Court) to entertain a controversy of this character rests on section 1334 of the Judicial Code.[18] This Court discussed the three prongs of section 1334's jurisdictional grant in its earlier decisions in *Sterling Optical*[19] and *Adelphia*[20] and will not repeat them at comparable length here. It is sufficient for the purposes of this analysis to note that section 1334 confers subject matter jurisdiction where the claims arise under the Code, arise in

---

[15]   For this reason, when the Court refers to a fiscal year (e.g., "Fiscal Year 2002"), it essentially refers to a calendar year, notwithstanding a late start in January and a spillover into January of the following year.

[16]   Ames Brief Exhibit B, Lease Article VIII, Sections 1 and 2.

[17]   The Court considers jurisdiction as a threshold issue. *See NWL Holdings*, 317 B.R. at 268 (citing *Liberian Int'l Ship & Corporate Registry v. Allfirst Bank (In re Millenium Seacarriers, Inc.)*, 2004 WL 63501, at *4, 2004 U.S. Dist. LEXIS 366, at *12 (S.D.N.Y. Jan. 14, 2004) (Patterson, J.) ("When a court's jurisdiction is challenged, the court has an obligation to resolve that issue before proceeding to the other issues in a proceeding.")).

[18]   28 U.S.C. § 1334. *See also NWL Holdings*, 317 B.R. at 268.

[19]   *Sterling Vision, Inc. v. Sterling Optical Corp. (In re Sterling Optical Corp.)*, 302 B.R. 792, 800-03 (Bankr. S.D.N.Y. 2003) (Gerber, J.).

[20]   *Buena Vista Television v. Adelphia Communications Corp. (In re Adelphia Communications Corp.)*, 307 B.R. 404, 412-14 (Bankr. S.D.N.Y. 2004) (Gerber, J.).

5

proceedings under the Code, or are related to cases under the Code.[21] As a result, the three types of jurisdiction that district (and hence bankruptcy) courts may exercise under section 1334 are colloquially referred to as "arising under," "arising in," and "related to" jurisdiction.[22]

Cure amounts must be fixed under section 365(b)(1)(A) of the Code. Therefore, this matter "arises under" and "arises in proceedings under" the Code. Also, the Court has "arising in" jurisdiction over this dispute because the Court expressly reserved jurisdiction over this matter in its Designation Rights Order and its Assignment Order.[23]

Finally, the instant controversy falls within the Court's "related to" jurisdiction as well, because the controversy directly affects Ames's estate.[24] As the Assignment Order makes clear, Ames has escrowed the disputed cure amount, and could gain or lose the return of that cure amount depending on this matter's outcome.[25] Thus, the Court's present determination will have a direct economic effect on Ames's estate.

Accordingly, the Court finds all three of "arising under," "arising in," and "related to" jurisdiction over the present controversy.

---

[21] *See NWL Holdings*, 317 B.R. at 269.

[22] *Id.*

[23] The Court retains jurisdiction over the enforcement of its own orders. *See id.* (considering its subject matter jurisdiction over a post-assignment dispute that related to the same Designation Rights Order that is operative here); *Concerto Software, Inc. v. Vitaquest Int'l, Inc.*, 290 B.R. 448, 453 (D. Me. 2003) (citing *Luan Inv. S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.)*, 304 F.3d 223, 230 (2d Cir. 2002)).

[24] *See NWL Holdings*, 317 B.R. at 269 (citing *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984); *Publicker Indus., Inc. v. United States (In re Cuyahoga Equip. Corp.)*, 980 F.2d 110, 114 (2d Cir. 1992); *Hunnicutt Co., Inc. v. TJX Cos., Inc. (In re Ames Dep't Stores, Inc.)*, 190 B.R. 157, 160 (S.D.N.Y. 1995) (Koeltl, J.); *Weisman v. Southeast Hotel Properties Ltd. Partnership*, 1992 WL 131080, at *3, 1992 U.S. Dist. LEXIS 7736, at *7 (S.D.N.Y. June 1, 1992) (Mukasey, C.J.)).

[25] Assignment Order at 2.

**B.    Lease Interpretation**

There are no material factual issues in dispute.[26] Instead, the parties disagree on how the Lease should be interpreted to apply to the undisputed material facts.

In interpreting the Lease, the Court is mindful that "a construction of a contract which produces unreasonable results should be avoided, if possible, and that a more reasonable construction should be sought."[27]

1.    Fixing Percentage Rent

Upon a vacating or assignment, the Averaging Provision allows Granite to calculate percentage rent for "each succeeding Fiscal Year" using "the average of gross sales reported for and with respect to the last three (3) Fiscal Years immediately preceding such assignment . . . or vacating."[28] Ames argues that the phrase "each succeeding Fiscal Year" here fixes rent for the remainder of the Lease—that the calculation applies to each (and every) year following.[29] But as Granite notes, the second sentence of the Averaging Provision suggests otherwise: "For so long as such assignment or subletting or vacating shall exist, this Article shall be of no further effect

---

[26]    The Court invited the parties to provide supplemental evidence for the adjudication of the present controversy. *See* Hr'g Tr. at 80:3 – 81:10. The parties agreed to submit affidavits to the Court in lieu of an evidentiary hearing. Stop & Shop Brief at 2. While only Granite filed an affidavit (the Newman Affidavit), the Court accepts all submissions that have been filed in contemplation of this adjudication and finds that the material facts asserted within are consistent and taken as true.

[27]    *Chemung Canal Trust Co. v. Montgomery Ward & Co.*, 163 N.Y.S.2d 332, 337 (3d Dep't 1957), *aff'd* 152 N.E.2d 542 (N.Y. 1958) (interpreting a lease's percentage rent provision) (citations omitted).

Although strictly speaking, the Court is applying the law of Connecticut (the location of the leased premises, Ames's principal place of business, and Granite's main office, if not its principal place of business as well), neither party has argued that choice-of-law is significant, and the Court has no reason to believe that anything other than basic principles of law apply.

[28]    Ames Brief Exhibit B, Lease Article VIII, Section 6.

[29]    Ames Brief at 16.

7

hereunder."[30] The word "such" in this second sentence unmistakably applies to the triggering event upon which Granite elected to utilize the Averaging Provision. So if the vacating is the triggering event, then "[f]or so long as such . . . vacating shall exist," the Averaging Provision operates, but upon the conclusion of the vacating, the Averaging Provision no longer operates and the calculation of percentage rent reverts to the standard formula provided in Article VIII, Sections 1 through 5.

Here, Granite asserts—and is bound by its assertion—that the vacating of October 2002 provided its basis for electing to invoke the Averaging Provision.[31] Thus, the

---

[30] Ames Brief Exhibit B, Lease Article VIII, Section 6.

[31] Ames vacated the premises in October 2002. Ames Brief at 7. Granite informed Ames of its election to utilize the Averaging Provision for Fiscal Year 2002 on June 12, 2003, several months after the vacating and "on the eve of assignment." *See* Ames Brief Exhibit A, Letter from Kevin M. Newman for Granite to David H. Lissey for Ames and Frank Eaton for Stop & Shop (June 12, 2003); Ames Brief at 9. After Ames argued that the assignment was the triggering event, not the vacating (Ames Brief at 4-5, 20-21), Granite responded:

> Granite could not request [Ames's] payment of percentage rent before May 2003 because it was not due under the Lease. In this case, Granite's request for payment of the percentage rent due under the Lease [in its letter of June 12, 2003] was as a direct response to [Ames's] assertion of an incorrect proposed cure amount in its proposed June 5, 2003 Notice of intent to assume and assign the Lease. Hence, contrary to [Ames's] unsupported speculation, the timing of Granite's demand for payment of the percentage rent due under the Lease bears no relation to [Ames's] ultimate decision to assume and assign the Lease to Stop & Shop and cannot logically be construed as a "reaction" to it.

Granite National Realty, LLC's Reply Brief in Opposition to [Ames's] Post-Hearing Brief and Stop & Shop's Response in Opposition to Granite National Realty, LLC's Post-Hearing Brief 3 (Nov. 25, 2003).

This is consistent with Granite's Newman Affidavit:
> 5. I then sent the Letter on June 12, 2003 to address Granite's concerns with the June 5, 2003 Notice.
>
> . . .
>
> 9. I never intended that the Letter would constitute an election by Granite to charge percentage rent in the amount set forth in the Letter for the rest of the term of the Lease and I do not believe that Article VIII of the Lease provides for the conversion of percentage rent to fixed percentage rent for the remaining term of the Lease.

Newman Affidavit ¶¶ 5, 9.

In light of the May 2003 deadline and the June 5, 2003 Notice, the Court finds Granite's election notification of June 12, 2003 to be reasonably timed. But more importantly, the

8

averaged percentage rent was not permanently fixed, but rather would remain only for so long as the premises were vacant.

### 2. Calculating Percentage Rent for Fiscal Year 2002

The parties dispute the significance of the phrase "each succeeding Fiscal Year" in another context as well. Ames contends that the "each succeeding Fiscal Year" language means that the Averaging Provision calculates percentage rent for the year(s) succeeding the triggering event. Thus, Ames argues that if Granite elected to base its use of the Averaging Provision on Ames's vacating of the premises in October 2002, the Averaging Provision would use the sales of Fiscal Years 1999, 2000, and 2001 to calculate percentage rent for Fiscal Year 2003, skipping Fiscal Year 2002.

Granite responds:

> [The Averaging Provision] is intended to provide for Granite['s] continued receipt of percentage rent despite any vacating by [Ames] or its successors or assignees. It is thus inconceivable that the parties meant there to be a one-year gap in Granite's receipt of this revenue. In fact, this interpretation of the Lease, as urged by [Ames], would reward the tenant for vacating and provide the tenant with the ability to avoid any obligation to pay percentage rent by vacating the day before the end of the fiscal year. It would also permit the tenant to vacate just before reaching the

---

Averaging Provision clearly states that the "Landlord may elect" to utilize it, thus empowering Granite to invoke or refrain from invoking the Averaging Provision. It follows that Granite can choose to invoke the Averaging Provision for one event, such as the vacating, but refrain from invoking it for another event, such as the assignment. Therefore, accepting Granite's assertions as true, the Court finds that Granite elected to use the Averaging Provision based on Ames's vacating.

By basing its election on the vacating, and by making the statements quoted above, Granite forfeited any right to use Ames's assumption and assignment to Stop & Shop as a basis for invoking the Averaging Provision at a later time. If Granite were trying to have it both ways and assert a continuous right to elect whatever it thought was in its best interest going forward, the Court would likely strike down the Averaging Provision as a kind of fee on assignment for providing Granite with rights that it did not possess prior to assignment. *See infra* notes 55-56 and accompanying text. Because the Court concludes that Granite is not trying to have it both ways (and because the Court is not allowing Granite to have it both ways), this issue does not affect the section 365(f) analysis below.

9

sales breakpoint after which percentage rent is payable and avoid any obligation to pay percentage rent for that fiscal year.[32]

The Court does not entirely agree with Granite's reasoning. After all, the Averaging Provision is utilized only at Granite's election. If the tenant were to generate large gross sales in a year but vacate the day before the year ended, Granite could decline to invoke the Averaging Provision and secure the benefits from those sales using the standard formula.

Nevertheless, the Court is persuaded that the "each succeeding Fiscal Year" language must relate to "the last three (3) Fiscal Years immediately preceding such" vacating, not the year of the vacating.[33] That is, the Averaging Provision calculates percentage rent for each year following, or "succeeding," the three full years whose sales form the basis of that calculation. The year of the triggering event is not skipped. This is the superior reading because the clear purpose of the Averaging Provision is to preserve the *continued* benefit of the landlord's bargain with respect to percentage rent, even if the tenant vacates and thus fails to accumulate gross sales, or in the event that the tenant assigns property to a new tenant whose gross sales decline below a level contemplated at the time the Lease was executed.

Put another way, it is unreasonable to understand the Averaging Provision to require the loss of percentage rent for an entire year before a landlord might reap any benefits from the Averaging Provision. As previously noted, percentage rent foreseeably could be, and was in several years, a substantial portion of total rent under this Lease—

---

[32]   Granite Brief at 5 (apparent typographical error corrected).

[33]   *See* Ames Brief Exhibit B, Lease Article VIII, Section 6.

10

averaging approximately 42% of total rent paid for Fiscal Years 1999 and 2000. It is clear that when the parties executed the Lease, they intended to offer the landlord some assurance that the bargained for rent would not diminish substantially in the future. It is simply unreasonable to believe that the Averaging Provision would allow zero percentage rent for an entire year after years when percentage rent approached and even exceeded $100,000.[34]

Using Granite's theory of computation, which the Court has now accepted, the percentage rent due for Fiscal Year 2002 as a cure amount is $83,617.59. The Court rules that such amount is properly owing to Granite.

## C.    Averaging Provision Enforceability

Ames and Stop & Shop argue that the Averaging Provision is unenforceable under section 365(f) of the Bankruptcy Code, saying it is tantamount to an anti-assignment clause.[35] The Court does not agree.

With exceptions not pertinent here, Bankruptcy Code section 365(f) provides, in relevant part:

> (1) . . . [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease . . . .

Section 365(f) functions to maximize an estate's value for creditors.[36] It protects creditors from provisions, typically in leases, which frustrate the estate's ability to

---

[34]    Percentage rent reached $94,000 in 1999 and $104,000 in 2000. Ames Brief Exhibit A; Granite Brief at 4; Stop & Shop Brief at 3.

[35]    *See* Ames Brief at 4-5; Stop & Shop Brief at 5-6.

[36]    *Hannaford*, 316 B.R. at 794.

11

convert a lease's economic value into cash.[37]  But while section 365(f) can, and should, be used to invalidate provisions that frustrate these goals, a bankruptcy court nevertheless must be attentive to the facts of a particular case to ensure that section 365(f) is not used indiscriminately.[38]

Thus, while section 365(f) gives a bankruptcy court the power to invalidate even provisions that *indirectly* restrict a debtor's ability to assign a lease, a bankruptcy court retains discretion in determining whether a lease provision hinders the possibility of assignment to a sufficient degree to render it unenforceable.[39]  Sometimes a provision will, and sometimes it will not:

> A court must examine the particular facts and circumstances of the transaction to determine whether a lease clause restricts or conditions assignment including the extent to which the provision hampers a debtor's ability to assign, whether the provision would prevent the bankruptcy estate from realizing the full value of its assets, and the economic detriment to the non-debtor party.[40]

---

[37] *Id.* As this Court stated in its earlier decision in Ames's chapter 11 case approving Ames's sale of designation rights:
> In the bankruptcy context, Congress has provided that the value in a debtor's unexpired leases should enure for the benefit of all of a debtor's creditors, and has provided that subject to the procedural safeguards of the Code (principally in section 365), debtors may assume and assign their interests in leases even without lessor consent, and that notwithstanding any provisions in leases that prohibit, restrict, or condition the assignment of those leases, they may nevertheless be assigned.  Using that power conferred under section 365 to assign leases even without lessor consent, debtor lessees can sell the lessee's interests in such leases to those willing to pay for them—converting, for their creditors, into the much more liquid asset of cash, the economic value in the leases.

*In re Ames Dep't Stores, Inc.*, 287 B.R. 112, 118-19 (Bankr. S.D.N.Y. 2002) (Gerber, J.) (citing 11 U.S.C. § 365(f)).

[38] *Hannaford*, 316 B.R. at 794.

[39] *Id.* at 794-95 (citing *In re Joshua Slocum, Ltd.*, 922 F.2d 1081, 1092 (3d Cir. 1990); *In re E-Z Serve Convenience Stores, Inc.*, 289 B.R. 45, 50 (Bankr. M.D.N.C. 2003); *In re Village Rathskeller, Inc.*, 147 B.R. 665, 672 (Bankr. S.D.N.Y. 1992) (Brozman, C.J.); *In re Mr. Grocer, Inc.,* 77 B.R. 349, 355 (Bankr. D.N.H. 1987) (Yacos, J.)).

[40] *Hannaford*, 316 B.R. at 795 (citing *E-Z Serve Convenience Stores*, 289 B.R. at 50).

12

In making such a determination, a court must consider the details of the proposed lease assumption and assignment to ensure that a proper balance is reached between the interests of the debtor-tenant and the economic detriment to the non-debtor.[41] Invalidation of a bargained for element of a contract under section 365(f) plainly is permissible, but "the modification of a contracting party's rights is not to be taken lightly."[42]

This is especially true where, as here, a shopping center lease is concerned.[43] In 1984, Congress enacted major amendments to the Bankruptcy Code and other bankruptcy-related provisions of federal law, including amendments to section 365 of the Code.[44] The amendments to section 365 emerged from legislation first introduced by Senator Hatch to address the problems perceived by shopping center landlords and solvent tenants concerning the bankruptcies of other tenants.[45] The amendments included, as relevant here, amendments to section 365(b)(3) that apply only to leases of real property in shopping centers. "Significantly, the legislative history makes plain that

---

[41]   *Id.*

[42]   *Id.* (citing *Slocum*, 922 F.2d at 1091).

[43]   Granite has asserted, and neither Ames nor Stop & Shop disputes, that the leased premises are located within a "shopping center" as the term is used in section 365 of the Code. *See* Granite Brief at 1 (citing *Slocum*, 922 F.2d at 1086-87).

[44]   *Hannaford*, 316 B.R. at 787 (citing The Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353, 98 Stat. 333).

[45]   *Id.* at 787-88 (citing 130 Cong. Rec. S8895 (daily ed. June 29, 1984) (statement of Sen. Hatch), *reprinted in* App. E Collier on Bankruptcy, at App. Pt. 6-173 (Lawrence P. King et al. eds., 15th ed. rev. 2001)).

   On April 20, 2005, the Bankruptcy Code was amended in material respects, which, inter alia, benefited landlords at the expense of the remainder of the creditor community. But those amendments (the bulk of which in any event will not become effective for another six months) are not relevant to this controversy. *See* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8 (2005).

13

Congress' purpose in its 1984 tightening up of section 365(b)(3) was to ensure that 'the lessor and other tenants [maintain] the benefit of the original bargain with the debtor.' It sought to eliminate any leeway in changing that bargain."[46]

In particular, section 365(b)(3)(B) requires that adequate assurance of future performance be provided when a shopping center lease is assumed under section 365, including adequate assurance "that any percentage rent due under such lease will not decline substantially."[47] Indeed, percentage rent is a hallmark of the type of working arrangement Congress sought to protect.[48] Use of percentage rent clauses encourages the inclusion of profitable, thriving businesses that generate consumer traffic for surrounding stores.[49] So under section 365(b)(3)(B), "in order to assure a landlord of his bargained for exchange, the court would have to consider . . . whether the kind of business proposed will generate gross sales in an amount such that the percentage rent specified in the lease is substantially the same as what would have been provided by the debtor . . . ."[50] Here, the Averaging Provision can fairly be regarded as a means to implement the spirit (and arguably the letter) of section 365(b)(3)(B).

---

[46] *In re Ames Dep't Stores, Inc.*, 127 B.R. 744, 752-53 (Bankr. S.D.N.Y. 1991) (Buschman, J.) (citing S. Rep. No. 65, 98th Cong., 1st Sess. 67, 68 (1983)), *cited in In re J. Peterman Co.*, 232 B.R. 366, 370 (Bankr. E.D. Ky. 1999).

[47] 11 U.S.C. § 365(b)(3)(B).

[48] *In re 905 International Stores, Inc.*, 57 B.R. 786, 788 (E.D. Mo. 1985).

[49] *Id.*

[50] *See Slocum*, 922 F.2d at 1091 (citing H.R. Rep. No. 595, 95th Cong., 1st Sess. 348-49, *reprinted in* 1978 U.S. Code Cong. & Adm. News 5963, 6305; S.R. Rep. No. 95-989, *reprinted in* 1978 U.S. Code Cong. & Adm. News 5787, 5845.), *cited in In re Ames Dep't Stores*, 121 B.R. 160, 165 (Bankr. S.D.N.Y. 1990) (Buschman, J.).

14

The Third Circuit's decision in *Slocum* provides important support for this determination. According to the Third Circuit's explanation of *Slocum* in a later decision:

> In *Slocum*, the bankruptcy court had authorized the trustee for the debtor lessee to assume a lease for retail space, excise an average sales clause allowing either the lessee or the landlord to terminate the lease if the lessee's average yearly sales fell below a set amount, and assign the lease pursuant to section 365. The bankruptcy court viewed the average sales clause as a disguised anti-assignment provision. The district court affirmed, and the landlord appealed. This court reversed, holding that the bankruptcy court had erred in ruling that the landlord's property was not a shopping center, and that, in light of the shopping center provisions of the Code, the bankruptcy court lacked the authority to excise the average sales clause from the lease.[51]

The *Slocum* court reasoned that the average sales clause at issue was "an essential bargained for element," and without it, the landlord could not be provided with adequate assurance of future performance.[52] Therefore, the bankruptcy court did not have authority to excise the average sales clause from the lease.[53]

The district court in *Rickel*, sitting as a bankruptcy court, invalidated provisions requiring the stores in question to be used as "home centers," or worse, "Rickel" or "Channel" home centers, in the face of evidence that such restrictions would effectively make assignment impossible.[54] But under the Lease here, assignment is not so foreclosed, especially when the parties revert to the standard percentage rent calculation

---

[51] *In re Rickel Home Centers, Inc.*, 209 F.3d 291, 300-01 (3d Cir. 2000), *writ of cert. denied*, 531 U.S. 873 (2000).

[52] *Slocum*, 922 F.2d at 1091.

[53] *Id.*

[54] *See In re Rickel Home Centers, Inc.*, 240 B.R. 826, 831-32 (D. Del. 1999), *appeal dismissed*, 209 F.3d 291 (3d Cir. 2000), *writ of cert. denied*, 531 U.S. 873 (2000).

15

once the premises are no longer vacant. Moreover, it cannot be said that the Averaging Provision is an assignment *fee*, because percentage rent was always calculated under the terms of the Lease, and the Averaging Provision merely attempts to continue such rent upon a vacating, assumption, or assignment. Thus, the instant controversy is distinguishable from cases in which lease terms provided that a landlord received a portion of the profit realized upon assignment,[55] or where profit sharing would apply to revenues after assignment when there had been no profit sharing previously[56]—terms that have properly been held to be unacceptable. The Averaging Provision merely attempts to provide for the continuation of the bargained for status quo.

### III.   CONCLUSION

The Averaging Provision is intended to provide Granite with the maintenance of percentage rent in an amount similar to that received before Ames vacated the leased premises. This function is not at odds with section 365(f) of the Code. Therefore, based upon the most reasonable interpretation of the Averaging Provision, Ames is to pay Granite the disputed cure amount of $83,617.59 as percentage rent due for Fiscal Year 2002.

SO ORDERED.

Dated:  New York, New York                    *s/ Robert E. Gerber*
        April 29, 2005                        United States Bankruptcy Judge

---

[55]   *See In re Jamesway Corp.*, 201 B.R. 73, 78-79 (Bankr. S.D.N.Y. 1996).

[56]   *See In re Lechters N.Y.C., Inc.*, No. 01-41432, ECF # 1174 (Dec. 23, 2002) (Gonzalez, J.).

16