UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| AMES DEPARTMENT STORES, INC., *et al.*, | ) | Case No. 01-42217 |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

BENCH DECISION ON ASSIGNMENT OF LEASEHOLD INTEREST FOR
PROPERTY LOCATED IN PASADENA, MARYLAND

APPEARANCES:

WEIL, GOTSHAL & MANGES LLP
Counsel for Debtors
767 Fifth Avenue
New York, New York 10153
By:   Timothy Q. Karcher, Esq. (argued)

WILLKIE FARR & GALLAGHER LLP
Counsel for Wal-Mart Stores, Inc. and
Wal-Mart Real Estate Business Trust
787 Seventh Avenue
New York, New York 10019
By:   John Longmire, Esq. (argued)
        Christopher J. St. Jeanos, Esq.

SAUL EWING LLP
Counsel for Colonial LLP and Broad Falls LLP
500 East Pratt Street, Suite 800
Baltimore, Maryland 21202
By:   Joyce A. Kuhns, Esq. (argued)

AKIN GUMP STRAUSS HAUER & FELD LLP
Counsel for Parkway Ventures, Inc.
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
By:   Jonathan L. Gold, Esq. (argued)
        Kenneth Davis, Esq.
        Deborah A. Drake, Esq.

OTTERBOURG, STEINDLER, HOUSTON & ROSEN, P.C.
Counsel for Creditors' Committee
230 Park Avenue
New York, New York 10169
By:    Harris J. Diamond, Esq.

BEFORE:    ROBERT E. GERBER
           UNITED STATES BANKRUPTCY JUDGE

In these jointly administered cases under Chapter 11 of the Code, Debtor Ames and its subsidiaries seek to assume and assign an unexpired lease of nonresidential real property located in Pasadena, Maryland (the "Ames Store") to Wal-Mart Real Estate Business Trust, a subsidiary of Wal-Mart Stores, Inc. (together, "Wal-Mart"), in accordance with certain designation rights.  Colonial Associates ("Colonial"), the over-landlord of the Ames Store; Broad Falls, an affiliate of Colonial; and Parkway Ventures ("Parkway"), Colonial's tenant and Ames' sub-landlord, object.  On March 30, 2006, I held a hearing on the matter (the "March 30 Hearing), and concluded that there were two material issues of fact related to the proposed assignment: whether the Ames Store is located in a shopping center, within the meaning of section 365(b)(3) of the Code, which imposes heightened restrictions on assumption and assignment of leases in shopping centers; and whether, if the Ames Store *is* located in a shopping center, the Debtors and Wal-Mart can provide adequate assurance, as required by section 365(b)(3)(D) of the Code, that the proposed assignment to Wal-Mart will not disrupt the tenant mix or balance in the center.  On June 15, 2006, I held an evidentiary hearing (the "June 15 Hearing") on these two open issues.

I now find, as a mixed question of fact and law, that the Ames Store is *not* located in a shopping center, within the meaning of section 365(b)(3), and that even if the Ames store were located in a shopping center, the proposed assignment would not violate

2

section 365(b)(3)(D), both because there is no tenant mix to disrupt, and because the proposed use of the premises—as a furniture store—could not in any way be regarded as a competitor of, or disruptive of the "mix" with, the single other tenant on the site, a medical facility.

## Facts

The 83,000 square foot Ames Store is located in a building (the "Ames/Parkway Building") that houses one other operational space, an approximately 46,000 square foot medical facility operated by Parkway. The entire Ames/Parkway Building and the adjoining parking area were originally leased by a predecessor in interest of Colonial to a predecessor in interest of Ames, pursuant to a lease dated May 21, 1973 (the "Prime Lease"). Other than the Ames/Parkway Building, there are no other buildings on, and no other operations in, the premises covered by the Prime Lease. Adjoining the Ames/Parkway building and parking area are four parcels of land owned by Broad Falls, which are not subject to either the Prime Lease or the Sublease, and which Broad Falls licenses as parking lots to neighboring businesses.

On June 22, 1995, Ames assigned the Prime Lease to Harbor Holdings, Parkway's predecessor in interest. Harbor Holdings then subleased back to Ames the portion of the Ames/Parkway Building (about 2/3 of it) in which Ames operated the Ames Store. If all renewal options are exercised, this sublease (the "Sublease") will expire in 2019. The Sublease provides that the Ames Store may be used for "any lawful purpose." The Prime Lease contains a similar provision. Neither the Sublease nor the Prime Lease provides for percentage rent or any restrictions explicitly affecting

assignment. The Sublease contains the primary rights that Ames seeks to assign to Wal-Mart.

At the March 30 Hearing, counsel for Wal-Mart informed me that, contingent on my approval of the proposed assignment from Ames to Wal-Mart, Wal-Mart intended to sublet the Ames Store to an unnamed retailer of furniture. After the March 30 Hearing, Wal-Mart entered into a sublease with Regency Furniture, Inc. ("Regency"), which plans to turn the Ames Store into a furniture retail store. The sublease between Wal-Mart and Regency is conditioned on Wal-Mart's ability to deliver timely possession of the Ames Store, which in turn is contingent on my approval of the proposed assignment from Ames to Wal-Mart.

At the June 15 Hearing, I took trial testimony in the form of affidavits from Abdul Ayyad, president of Regency, and M. John Meyer, Wal-Mart's real estate broker, both on behalf of Wal-Mart and Ames, from Jay Gouline, agent for Colonial, on behalf of Colonial, and from Meg Medoff, a property manager at Parkway, on behalf of Parkway. I also heard Colonial's live cross-examination of Abdul Ayyad.

## Discussion

The Bankruptcy Code imposes heightened restrictions on the assumption and assignment of leases of real property in shopping centers.[1] In enacting the so-called "Shopping Center Amendments" to section 365, "Congress recognized that unlike the usual situation where a lease assignment affects only the lessor, an assignment of a shopping center lease to an outside party can have a significant detrimental impact on

---

[1] *See* 11 U.S.C. § 365(b)(3).

4

others, in particular, the center's other tenants."[2]  Section 365(b)(3) provides in relevant part:

> . . . adequate assurance of future performance of a lease of real property in a shopping center includes adequate assurance—
>
> (A) of the source of rent and other consideration due under such lease, and in the case of an assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease;
>
> (B) that any percentage rent due under such lease will not decline substantially;
>
> (C) that assumption or assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as a radius, location, use or exclusivity provision, and will not breach any such provision contained in any other lease, financing agreement, or master agreement related to such shopping center; and
>
> (D) that assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center.

However, the Code does not define "shopping center." The multi-factor test set forth by the Third Circuit in *Joshua Slocum*[3] is regularly used by courts in determining whether premises are a "shopping center" under section 365(b)(3). It calls for consideration of the following factors—whether there is:

> 1. A combination of leases;

---

[2] *In re Joshua Slocum*, 922 F.2d 1081, 1086 (3d Cir. 1991); *see also* my discussion of the "Shopping Center Amendments" in *Hannaford Bros. Co. v. Ames (In re Ames Dep't Stores)*, 316 B.R. 772, 787-788 (Bankr. S.D.N.Y. 2004) ("*Ames/Hannaford*").

[3] 922 F.2d at 1087-88.

5

2. All leases held by a single landlord;

3. All tenants engaged in the commercial retail distribution of goods;

4. The presence of a common parking area;

5. The purposeful development of the premises as a shopping center;

6. The existence of a master lease;

7. The existence of fixed hours during which all stores are open;

8. The existence of joint advertising;

9. Contractual interdependence of the tenants as evidenced by restrictive use provisions in their leases;

10. The existence of percentage rent provisions in the leases;

11. The right of the tenants to terminate their leases if the anchor tenant terminates its lease;

12. Joint participation by the tenants in trash removal and other maintenance;

13. The existence of a tenant mix; and

14. The contiguity of the stores.

Of these factors *Collier* states, "it is likely that the most important characteristic will be a combination of leases held by a single landlord, leased to commercial retail distributors of goods, with the presence of a common parking area."[4]

Applying the *Joshua Slocum* factors to the facts of this case, it is clear to me that the Ames Store is not located within a "shopping center" within the meaning of section 365(b)(3) of the Code.

---

[4] 3 *Collier on Bankruptcy* ¶ 365.05[5].

First, the Ames/Parkway Building and adjoining parking lot are not subject to a "combination of leases" held by a single landlord. There is a single Prime Lease between Colonial and Parkway and a single Sublease between Parkway and Ames.

Second, other than the Ames Store, which has been closed since 2002, there are no retail operations in the Ames/Parkway building, nor are there any retail operations being conducted in any of the adjacent parcels owned by Broad Falls—assuming, though I doubt it, that such is relevant.

Third, there is no evidence that the Ames/Parkway Building was "purposely developed" as a shopping center. The Prime Lease and the Sublease contain none of the provisions that reflect the sort of uniform design plan that typify shopping center leases such as use restrictions, operating covenants, percentage rent provisions or restrictions on assignment. Notably absent are provisions intended to protect retailers from other retailers selling the same or similar goods, or intended to create an array of different types of retail offerings. Additionally, it is clear to me that the Ames/Parkway Building and the adjacent parcels owned by Colonial's affiliate Broad Falls were not "purposely developed" together, as a shopping center. Colonial contends that it *intended* to develop the Ames/Parkway Building and surrounding parcels owned by Broad Falls together as a shopping center, and blames its failure to do so in part on Ames' 2001 bankruptcy filing.[5] However, Colonial's wish to someday transform these properties into a shopping center is not a substitute for Colonial's failure over the past 30 years to do so.[6] The purpose of

---

[5] *See, e.g.,* Gouline Aff. at ¶¶ 35, 39; Colonial Supp. Br. at 15.

[6] I do not rule out the possibility that a developer could implement a unified plan for a shopping center by means of subsidiaries or affiliates. But there is no indication that that was done here, at least by the time the Prime Lease was entered into in 1973. The fact that Colonial and Broad Falls have interests in adjoining parcels is insufficient, without more, to transform the Ames/Parkway Building into a shopping center.

7

the Shopping Center Amendments and the *Joshua Slocum* factors is to protect *real* and *existing* shopping centers—not vacant parcels and empty buildings.  If courts were to consider what a landlord might have done with a piece of property when determining whether that property was "purposely developed" as a shopping center, any landlord could attempt to restrict assignment of a lease by claiming that it intended to someday turn that property into a shopping center.

Fourth, there is no "master lease" governing the Ames/Parkway Building.

Fifth, there are no "fixed hours" during which Ames and Parkway (which, incidentally, is not a store, but a medical facility) are open.

Sixth, there is no evidence of a joint advertising program in place with respect to the Ames/Parkway Building or the Broad Falls parcels.

Seventh, there are no restrictive use provisions or percentage rent provisions in either the Prime Lease or the Sublease.  Once more I note (and this is particularly significant) that neither of these contracts contains *any* of the types of provisions intended to limit internal or external competition or to create synergies among tenants, such as exclusivity clauses, radius clauses, percentage rent provisions or provisions protecting tenants from the loss of an anchor tenant.  By contrast, both the Prime Lease and the Sublease provide that Ames may use the premises for any lawful purpose.

Eighth, neither the Prime Lease nor the Sublease provides Ames or Parkway a right to terminate based on a termination of any other tenant's lease or occupancy.

Ninth, as to tenant mix, because the only tenants are the closed Ames Store and the Parkway medical facility, the proposed assignment cannot disturb the tenant mix,

because there is no tenant mix to disturb.  The concept of tenant mix is entirely meaningless under these circumstances.

Finally, there is no contiguity of stores.  While the Ames Store and Parkway medical center share a common wall, there is no internal door or passageway for customers to pass between these spaces.

Although Ames and Parkway do share a parking lot and common area maintenance payments, these factors are insufficient to tip the analysis the other way, and without more, do not support the conclusion that the Ames/Parkway Building is a shopping center.  I find particularly relevant that there are now *no* retail operations there, and that even after the proposed assignment, there will be only one.  Additionally, in the absence of the usual shopping center provisions for coordinating multiple retail tenancies, I do not believe that even if Parkway were also a retailer, such facts would support a finding that the two stores together constituted a shopping center.

Colonial argues that I should adopt a definition of "shopping center" promulgated by a trade association, the International Council of Shopping Centers (the "ICSC").  The ICSC defines "shopping center" as: "[a] group of retail and other commercial establishments that is planned, developed, owned and managed as a single property, with on-site parking provided."  However, while bankruptcy courts regularly employ the factors set forth in *Joshua Slocum* and its progeny in determining whether or not premises are a shopping center, Colonial cites to no cases, nor am I aware of any, in which a court has ever adopted the ICSC shopping center definition in interpreting section 365, or, as importantly, considered it as a basis to disregard the seminal case in the area.  Additionally, I agree with Wal-Mart that even if I adopted the ICSC definition, the

9

Ames/Parkway building would *still* not constitute a shopping center, because there are no retail or commercial establishments in that building or in the surrounding Broad Falls parcels that could compose a shopping center under the ICSC definition.

Moreover, if I were to hold that the Ames/Parkway building is a shopping center, I could not find a section 365(b)(3) violation here. As I stated earlier in applying the *Joshua Slocum* factors to the facts of this dispute, because there are no retail operations at the Ames/Parkway building, or in the adjacent Broad Falls parcels, there is no tenant mix to disrupt by the proposed assignment to Wal-Mart. At the March 30 Hearing, I concluded that the Debtors and Wal-Mart had plainly satisfied the first three requirements of section 365(b)(3).[7] I found that subsection 365(b)(3)(A) was satisfied because Wal-Mart's financial condition and operating performance in the relevant timeframe was similar, if not markedly better, than the financial condition and operating performance of Ames.[8] I further found that subsection (b)(3)(B) was not an issue, because there is no percentage rent obligation in either the Prime Lease or the Sublease, and that subsection (b)(3)(C) was satisfied, because the Prime Lease and the Sublease permit the tenant to use the premises for any lawful purpose.

---

[7] *See* March 30 Hearing Tr. at 56.

[8] Colonial argues that 365(b)(3)(A) has not been satisfied as to Regency because Regency is allegedly a "chronically defaulting tenant, and poor credit risk." Colonial Supp. Br. at 23. After hearing Colonial's cross-examination of Mr. Ayad, I agree with Colonial that Regency had more defaults in the past than it admitted to; would have a way to go before it could be regarded as a blue chip tenant; and that there are material risks that Regency could default on its sublease with Wal-Mart. But these concerns do not alter the fact that the financial obligor in this proposed assignment that must satisfy the requirements of 365(b)(3)(A) is *Wal-Mart*, not Regency. Colonial is twice removed from concerns about Regency's financial viability, with obligors Parkway and Wal-Mart insulating Colonial from financial risk. As Wal-Mart's counsel properly observed at the June 15 Hearing, any potential financial problems with Regency are Wal-Mart's problem.

However, I was initially concerned, because Wal-Mart had not definitively stated what kind of business would be taking over the Ames store, that the proposed assignment to Wal-Mart, and Wal-Mart's subsequent assignment to another tenant, would disrupt the tenant mix or balance in the Ames/Parkway Building. If, for example, Wal-Mart proposed to assign the lease to a medical center, which would then be in direct competition with the Parkway medical facility next door, I would be concerned about tenant mix and balance.[9] And a concern of this character was one of the factors that drove my decision in the *Ames/Hannaford* matter, where I refused to authorize a new supermarket to be set up across the parking lot from an existing one.[10] Wal-Mart has now stated that it has entered into a sublease with Regency, which plans to open a furniture store in the Ames space. I therefore find (assuming it were to apply) section 365(b)(3)(D) to be satisfied because the proposed assignment to Wal-Mart, and Wal-Mart's subsequent assignment to Regency, would not disrupt any tenant mix or balance in the Ames/Parkway Building.

In a legislative judgment built into the Code, Congress has determined that, subject only to certain statutory safeguards, the value of a debtor's leases should go to the debtor's creditors, and that leases can be sold to achieve that end—with or without landlord consent. Here, Colonial has shown no legally cognizable basis for interfering with the assumption and assignment of this lease—which is, after all, the norm in bankruptcy, to implement that Congressional policy in order to benefit the general body

---

[9]     *See Rockland Center Assocs. v. TSW Stores of Nanuet, Inc.*, 34 B.R. 299, 307 (Bankr. S.D.N.Y. 1983) (in assessing whether an assignment will disturb tenant mix and balance in a shopping center, "[t]he level of competition between stores in [the] shopping center must be considered . . .").

[10]    *See Ames/Hannaford,* 316 B.R. 772 (full cite at n.2).

11

of the debtor's creditors, and not the single creditor landlord that would like to get a lease back. I fully understand why a landlord would like to terminate a 1973 lease under which it gets a below market rate, but Congress has determined that the economic value in below market leases is to go to creditor bodies generally, and not to a windfall for a single creditor.

Colonial raised one other issue in its Supplemental Objection that I will now address. Colonial argues, for the first time, that although the Debtors assigned the Prime Lease to Parkway six years before the Debtors filed for bankruptcy, the Prime Lease terminated by operation of section 365(d)(4) of the Code, because the Debtors did not specifically identify it in their August 20, 2001 motion for an order extending their time to assume or reject unexpired leases of nonresidential real property, which I granted.

First, I reject Colonial's argument that the Debtors were required to assume or reject a lease that had already been fully assigned to another party prior to the Ames bankruptcy, and that by the Debtors' failure to do so, the lease was forfeited. It may be that under the law of many states, an entity that had assigned a lease would retain a monetary exposure for unsatisfied lease obligations, in the nature of a guaranty, if the lease were not performed. But that would simply give rise to a prepetition claim—and a contingent one, at that, in a case like this one where the rent continued to be paid. Any vestigial guarantor liability the Debtors may have retained in the previously assigned Prime Lease after assigning it to Parkway would not, without more, transform the Prime Lease into an "unexpired lease of the debtor" capable of self-destruction under 365(d)(4). With the Debtors having parted with the lease, such a reading would be inconsistent with the plain meaning of section 365(d)(4), and common sense; would lead to forfeitures of

12

the rights of lease assignees, like Parkway, who acquire leases from debtors prior to bankruptcy (in this case, six years before bankruptcy); and would in turn wreak havoc on the predictability of commercial dealings in the real estate lease assignment area. Did Congress really intend to cause third party assignees (like Parkway, but also thousands of others) to have their leases at risk based on the inaction of others over whom the assignees would have no control, and who, perhaps years thereafter, might file a petition in bankruptcy? And did Congress contemplate that any sane entity would take a lease assignment with such a risk? There is no basis, in the language of the Code, or elsewhere, for a conclusion that Congress ever intended such an absurd result.

Second, I agree with the Debtors, and with Parkway, that the Debtors' 365(d)(4) motion sought to extend the time to assume or reject *all* of the Debtors' unexpired leases of nonresidential real property, and that it was not limited to those leases listed on an "Exhibit A" to the motion. The Debtors specifically stated in the 365(d)(4) motion that "Exhibit A" listed "all or substantially all" of their unexpired leases, presumably because the 365(d)(4) motion was filed on the same day the Debtors' chapter 11 petitions were filed and the Debtors did not want a clerical error or omission to result in excluding any of the Debtors' hundreds of leases from the extension. The Debtors also specifically named and described the Prime Lease in their Designation Rights Agreement, which was approved by this Court on January 30, 2006. Colonial had notice of the Designation Rights Agreement, but did not then say that that the Prime Lease had previously been rejected, or make an objection on such a premise. The order approving the Designation Rights Agreement is now a final, non-appealable order and constitutes the law of this case. Colonial may not now, years after the fact, argue otherwise.

13

Ames and Wal-Mart are to settle an order approving the assumption and assignment of the Ames Store.  Additionally, if Ames and Wal-Mart wish, they may submit supplemental findings of fact and conclusions of law in connection with my earlier rulings at the March 30 Hearing.

Dated: New York, New York                                  **/s:/ *Robert E. Gerber***
       July 5, 2006                                                   United States Bankruptcy Judge